IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| ELIZABETH SCHULTZ AND § <br> MICHAEL SCHULTZ, INDIVIDUALLY § <br> AND AS NEXT FRIEND OF § <br> A.L.P., H.S., AND P.S., MINORS, § <br> Plaintiffs, § <br> § <br> v. § <br> § <br> LINDSEY ERCOLE, DO § <br> CHEYENNE MANGOLD, MD, MPH § <br> REBECCA I. HERNANDEZ, MD, § <br> IN THEIR INDIVIDUAL CAPACITIES § <br> AS ADMINISTRATORS AND/OR § <br> EMPLOYEES OF UNIVERSITY § <br> HEALTH SYSTEM ("UHS") § <br> Defendants. § | Civil Action No. <u>21-1043</u> <br> JURY DEMANDED |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE COURT:

COME NOW Plaintiffs, Elizabeth Schultz ("Elizabeth") and Michael Schultz ("Michael"), Individually and as Next Friend of A.L.P., H.S., and P.S., Minors, (sometimes collectively referred to as "SCHULTZES") and file this Original Complaint against Defendants Lindsey Ercole, DO ("Ercole"), Cheyenne Mangold, MD ("Mangold"), Rebecca I. Hernandez, MD ("Hernandez"), and University Health System ("UHS") and would show the Court as follows:

### A. PARTIES AND SERVICE

1. Plaintiff, Elizabeth Schultz, is an individual and resident of San Antonio, Bexar County, Texas.

2. Plaintiff, Michael Schultz, is an individual and resident of San Antonio, Bexar County, Texas.

3. Plaintiff, A.L.P., is an individual and resident of San Antonio, Bexar County, Texas.

4. Plaintiff, H.S., is an individual and resident of San Antonio, Bexar County, Texas.

5. Plaintiff, P.S., is an individual and resident of San Antonio, Bexar County, Texas.

6. Defendant, LINDSEY ERCOLE, DO, upon information and belief is an employee of Defendant, University Health System, is an individual and a citizen of the State of Texas, and may be served with process at 407 E. Nottingham Drive, San Antonio, Texas 78209, or wherever she may be found.

7. Defendant, CHEYENNE MANGOLD, MD, MPH, upon information and belief is an employee of Defendant University Health System, is an individual and a citizen of the State of Texas, and may be served with process at 6234 Cherrywest Circle, San Antonio, Texas 78240, or wherever she may be found.

8. Defendant, REBECCA I. HERNANDEZ, MD, upon information and belief is an employee of Defendant University Health System, is an individual and a citizen of the State of Texas, and may be served with process at 11138 Heubner Oaks, Apt. 276, San Antonio, Texas 78230, or wherever she may be found.

9. Defendant, UNIVERSITY HEALTH SYSTEM ("UHS") is the public hospital district for the San Antonio, Texas metropolitan area. It is owned and operated

by Bexar County, therefore UHS may be served with process on Bexar County Judge Nelson W. Wolff, 101 W. Nueva, 10th Floor, San Antonio, Texas 78205, or wherever he may be found.

## B. JURISDICTION

10. The Court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. §1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statutes providing for the protection of civil rights. This suit arises under the United States Constitution and the following federal statutes: 42 U.S.C. §1983.

11. The Court has personal jurisdiction over the natural person Defendants because they reside and are domiciled in, and are citizens of, Texas.

12. Additionally, this action is based upon the Federal Tort Claims Act of August 2, 1946. 60 Stat 843; USCA, Title 28 §§134(b), 2671, et.seq.

## C. VENUE

13. Venue is proper in this district under 28 U.S.C. §1391(b)(1) because all of the Defendants are domiciled within the geographical confines of the Western District of Texas.

14. The incident giving rise to this lawsuit occurred in Bexar County, Texas, which is within the geographical confines of the Western District of Texas. Accordingly, venue is proper in the Western District of Texas, San Antonio Division, pursuant to 28 U.S.C. §1391(b)(2).

## D. FACTS

15. This case entails false allegations of child abuse and neglect made by medical providers at a public hospital against the parents of a child patient. All of the facts and assertions herein are based upon information and belief.

16. A.L.P. is a child who has been diagnosed with Attention Deficit Hyperactive Disorder ("ADHD"), Oppositional Defiant Disorder ("ODD"), Obsessive Compulsive Disorder ("OCD"), Autoimmune Encephalitis and most recently Pediatric Acute-onset Neuropsychiatric Syndrome ("PANS").

17. A.L.P. had been experiencing behavioral changes and waxing/waning mental status for the three weeks prior to her hospital admittance.

18. On or about October 6, 2019, A.L.P. experienced a major neurological episode.

19. On or about October 7, 2019, around 4:30 p.m. ELIZABETH took A.L.P. to the emergency room at North Central Baptist Hospital due to the acute sudden onset of symptoms. A.L.P. was experiencing psychological and physical symptoms including, but not limited to, blacking out, panic attacks, hallucinations, inability to control emotions, extreme rage, loss of bladder control and pain over her entire body, etc. A.L.P. was discharged from North Central Baptist Hospital that night.

20. On or about October 8, 2019, ELIZABETH took A.L.P. to Clarity Child Guidance Center ("Clarity") where she was admitted as an inpatient for approximately four (4) days. A.L.P. was discharged on or about October 12, 2019, from Clarity.

ELIZABETH was told that what A.L.P. suffered from was not psychiatric in nature; rather, that she had experienced an acute anxiety attack.

21. A.L.P. continued suffering from her disorder and was experiencing headaches and severe fatigue.

22. On or about October 16, 2019, ELIZABETH took A.L.P. to Mindworks Counseling of Texas ("Mindworks"), a counseling center in San Antonio, Texas. ELIZABETH was told by Anne Esquivel, of Mindworks, that she needed to take A.L.P. to the hospital due to facial paralysis and auditory hallucinations.

23. On or about October 16, 2019, ELIZABETH took A.L.P. to North Central Baptist Hospital where A.L.P. was admitted.

24. On or about October 18, 2019, A.L.P. was discharged from North Central Baptist Hospital. ELIZABETH was told that A.L.P. could possibly have PANS and that she needed psychiatric help.

25. On or about October 19, 2019, ELIZABETH took A.L.P. to the emergency room at University Hospital due to worsening symptoms. She was admitted to the pediatric ward where she underwent testing to include lab work, an EEG exam, Lumbar Puncture procedure ("LP"), Autoimmune Encephalitis Panel, CT scan and a routine follow-up MRI, among other tests. Dr. Alexandria I. Quintanilla's notes from that day state "Addison is a 9 yo F w/OCD and ADHD presenting with episodic odd behavior and AMS concerning for PANDAS vs PANS vs a stress or adjustment disorder to unknown event vs autoimmune encephalitis."*See Exhibit "A."*

26. On or about October 21, 2019, A.L.P. continued to experience a heightened mental status and became more forgetful, angry, disoriented and agitated as the evening progressed. She wet her bed that night. She was not able to recall her own name or who her mother was. She complained of having a severe headache and neck pain.

27. A.L.P. received a three-day treatment course of high-dose steroids during her hospital stay.

28. On or about October 24, 2019, A.L.P. was released from the hospital after her symptoms improved.

29. On or about October 25, 2019, around 4:10 p.m. ELIZABETH took A.L.P. back to the emergency room at University Hospital for symptoms related to A.L.P.'S autoimmune and psychological disorders after A.L.P. stated she was not feeling well again and was complaining of body aches. A.L.P. was exhibiting child-like behavior and had become agitated and could not control her anger. ELIZABETH requested that A.L.P. be given the steroid treatment from the last hospital stay as it had improved A.L.P.'s symptoms. ELIZABETH then became frustrated and exasperated because no one would listen to her and no one could figure out what was wrong with her daughter. ELIZABETH attempted to provide information, on several illnesses or disorders that could be causing A.L.P.'s symptoms, to the triage staff. The medical staff notated that "Mother of Child ("MOC") seems manic or hypomanic with psychotic features. Will consult case management for evaluation and possible CPS referral."

30. On or about October 25, 2019, around 6:48 p.m. A.L.P. was readmitted as an inpatient to the pediatric ward of University Hospital. The nurses during that day's

night shift gave A.L.P. a second dose of Lexapro stating that it was "unknown that MOC had already given it that day," even though ELIZABETH had told them that she had already given A.L.P. Lexapro that day.

31. Sometime between October 19, 2019, and October 25, 2019, after contacting various experts in the field of autoimmune encephalitis disorders, ELIZABETH spoke with Suzanna Gazda, M.D., ("Dr. Gazda"), Integrative Neurology, San Antonio, Texas. Dr. Gazda diagnosed A.L.P. with PANS.

32. On or about October 26, 2019, around 7:52 a.m., HERNANDEZ indicated on the chart notes that there was a concern for a "potential traumatic event which could have triggered symptoms." She further noted that "Per neuro phone call with Dr. Aveces, no further intervention or IV Solu-Medrol is clinically indicated at this point and neuro feels like psych needs to be reengaged," and that "multiple red flags identified by ED physician and by pediatrics team. There is concern for possible abuse or traumatic event leading to A.L.P.'s regression. [ELIZABETH's] mental state is also a concern, in addition to A.L.P.'s step-father being absent during these hospitalizations. -Social work consulted by ER Physician-Consider CPS and CFM involvement-Due to MOC devout faith, offer Chaplain to come and see her and A.L.P.." HERNANDEZ further indicated that "She returned due to returning symptoms – mother felt that she needed more treatment with IV steroids. After extensive discussions with multiple specialists including Neurology and Immunology, we determined that the risks of IVIG did not outweigh any possible benefit due to uncertain diagnosis. Social worker returned today – felt there was significant risk of A.L.P. returning to her home without CPS evaluation due to mother's

7

behavior in the ED and on the floor. Will complete evaluation prior to discharge. Will revisit possibility of IVIG with Immunology (Dr. Infante) tomorrow. Mother feels that this may be PANDAS/PANS after a discussion with a private neurologist, (outside of UHS) and would like further explanation of this diagnosis." (ELIZABETH had shared the information on the diagnosis by Dr. Gazda to the nurses and doctors and wanted clarification and further information on treatment options from them.)

33. On or about October 26, 2019, between 1:00 p.m. and 4:00 p.m. ELIZABETH went to ERCOLE's office, the doctor on call that day, to discuss the PANS diagnosis by Dr. Gazda. ELIZABETH had Dr. Gazda on the phone and wanted ERCOLE to speak to Dr. Gazda to get more information on the PANS diagnosis. ERCOLE informed ELIZABETH that she had about 15 other patients, and that she was on her lunch break and ELIZABETH was going to have to wait. ERCOLE then slammed the door in ELIZABETH's face.

34. On or about October 26, 2019, around 8:00 p.m. ELIZABETH had an altercation with the nurses regarding A.L.P.'s care and mentioned that she tried to speak to ERCOLE but that ERCOLE had slammed the door in her face. ERCOLE came out from her office and said that she apologized and did not mean to slam the door in her face. ERCOLE then mentioned that they had notified a social worker and had made a CPS report.

35. On or about October 26, 2019, around 10:00 p.m. ELIZABETH began to tidy up A.L.P.'s hospital room. While doing so, she found a packet of about 6 pages that were stapled together. The pages were that day's chart notes from the nurses'/doctor's

rounds earlier that day. *See Exhibit "B."* They included medical information on the pediatric patients in that ward along with A.L.P.'s information. Under A.L.P.'s entry, it was indicated that A.L.P. was to be "DISCHARGE[D] TODAY" (10/26/2019). ELIZABETH informed the nurses that she was taking A.L.P. home and that she was going to sue them. The nurses and ERCOLE prohibited ELIZABETH from leaving with A.L.P. and threatened her with further CPS involvement if she walked out of the hospital with her child, saying "We're sorry. You can't leave and guess what else, we called CPS, so if you try to leave we will call the police officers on you and they'll stop you."

36. On or about October 29, 2019, A.L.P. was discharged from the pediatric ward of University Hospital. Upon arriving home, CPS was waiting to speak to ELIZABETH regarding the complaint made by UHS. In the weeks that followed, Plaintiffs were subjected to an invasive and traumatic investigation based on unwarranted claims of physical abuse and medical neglect.

37. Following several weeks of investigation, during which the SCHULTZES hired an attorney to help them with the CPS case, CPS ruled out the abuse and medical neglect claims against ELIZABETH and MICHAEL on or about December 2, 2019. *See Exhibit "C."*

38. ERCOLE'S decision to make false allegations of child abuse or neglect against ELIZABETH to Child Protective Services was pursuant to and consistent with the policies of UHS.

## E. Cause of Action Against All Natural Person Defendants Under 42 U.S.C. §1983 for Violation of 14th Amendment Due Process Rights to Reasonable Medical and/or Mental Health Care, to be Protected, and not to be Punished

39. Under the Fourteenth Amendment to the United States Constitution, a patient at a hospital or health facility, has constitutionally-protected liberty interests, including, but not limited to, reasonable safe conditions, adequate medical treatment, to be protected and not to be punished and to have the freedom to refuse treatment and leave if medical needs are not being met.

40. Defendants had a duty to exercise that degree of care on the occasion in question that a reasonable and prudent person would have exercised under the same or similar circumstances and wholly failed to do so, thus breaching the duty owed to Plaintiff A.L.P., which proximately caused the occurrence in question, and Plaintiff's resulting injuries and damages.

41. Plaintiff's injuries were proximately caused by Defendants' negligent, careless and reckless disregard of this duty. The negligent, careless and reckless disregard of the duty owed to Plaintiff by Defendants consisted of, but is not limited to, the following acts and omissions:

    a. Failure to provide adequate medical care, testing and diagnosis.
    b. Failure to assure the patient's needs were being provided for.
    c. Threatening mother of patient with social worker and CPS involvement if mother continued to lash out.
    d. Retaliatory behavior following mother of patient finding the doctor's notes that were inadvertently left in patient's room.
    e. Failure to exhaust all possible leads, information and testing to ensure proper diagnosis.
    f. Failure to discuss possible PANS diagnosis by previous doctor (Dr. Gazda) with mother of patient based on information received by Dr. Gazda.

g. Failure to allow patient and mother to discharge from hospital on date indicated on chart notes due to retaliatory behavior meant to punish mother of patient and patient herself.

42. Defendants ERCOLE, MANGOLD and HERNANDEZ acted under color of state law at all times referenced in this pleading. Defendants chose to ignore ELIZABETH's pleas for help for her daughter and instead chose to focus on ELIZABETH's mental status and conjured up allegations that A.L.P.'s episodes were triggered by physical abuse or a traumatic event occurring at home. Defendants retaliated against Plaintiffs A.L.P. and ELIZABETH and prevented them from refusing further treatment and leaving the hospital on October 26, 2019.

### F. CAUSE OF ACTION AGAINST UNIVERSITY HEALTH SYSTEM – INTENTIONAL ACTS RESULTING FROM DELIBERATELY INDIFFERENT CUSTOMS OR POLICIES

43. At the time of the occurrence of the act in question and immediately prior thereto, Defendant UHS, by and through their official, ERCOLE, made a deliberate choice to follow a course of action among various alternatives with respect to the subject matter in question. ERCOLE was required to have read the previous medical records related to A.L.P.'s visit wherein Dr. Gazda opined on the cause of A.L.P.'s neurological and medical issues. ERCOLE had the choice to listen to A.L.P.'s mother and communicate with the medical doctor A.L.P.'s mother was able to present for a medical consultation concerning A.L.P.'s neurological and medical issues. ERCOLE chose to follow neither course of action and instead fabricated evidence in order to report A.L.P.'s mother to Texas Child Protective Services.

44. At the time of the occurrence of the act in question and immediately prior thereto, Defendant UHS, by and through their official, ERCOLE, performed an act pursuant to an official policy which caused the constitutional tort. ERCOLE'S decision to make false allegations of child abuse or neglect against ELIZABETH to Child Protective Services was pursuant to and consistent with the policies of UHS.

45. Plaintiffs would show that Defendant UHS, by and through their official, ERCOLE, disregarded a known or obvious consequence to her actions. Further, ERCOLE knew that pursuing unfounded allegations against A.L.P.'s mother would lead to a CPS investigation and would cause emotional distress for A.L.P.'s entire family. Instead, ERCOLE disregarded the opinions of medical professionals and continued to fabricate information against A.L.P.'s family.

### G. CAUSE OF ACTION AGAINST DEFENDANTS – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

46. Plaintiffs reallege and incorporate by reference those paragraphs set forth above as if fully set forth herein.

47. Defendants owed a duty to Plaintiffs to act as reasonable, prudent persons. This duty includes an obligation to act in a careful, lawful, and prudent manner and in full compliance with applicable federal law.

48. Defendants' conduct toward Plaintiffs resulted in a breach of Defendants' duties to act as reasonable, prudent persons.

49. Emotional distress was a field of danger that Defendants should reasonably have anticipated and guarded against.

50. Further, Defendants intentionally used the threat of police action and report to CPS to place fear in ELIZABETH and A.L.P. to remain at the hospital.

51. Defendants' actions were extreme and outrageous and Defendants intended to inflict distress onto ELIZABETH and A.L.P.

52. Defendants' conduct resulted in the Plaintiffs' severe emotional distress.

53. As a result of Defendants' breach of their duties, Plaintiffs suffered legally compensable emotional distress damages.

**H. CAUSE OF ACTION AGAINST DEFENDANTS – FALSE IMPRISONMENT**

54. Defendants' actions constituted false imprisonment in that said actions constituted an unreasonable restraint, by state actors acting under color of law, of Plaintiff's individual liberty, against Plaintiff's will, and without probable cause.

55. Said actions by Defendants constituted an unlawful seizure and deprivation of due process in violation of Plaintiff's rights as secured by the Fourth and Fourteenth Amendments to the Constitution of the United States.

56. Said actions were taken pursuant to and consistent with the policies of UHS

**I. CAUSE OF ACTION AGAINST DEFENDANTS – MALICIOUS PROSECUTION**

57. Defendants' actions constituted malicious prosecution in that Defendants, as state actors acting under color of law, maliciously initiated adverse legal processes against Plaintiffs without probable cause.

58. Said actions by Defendants constituted an unlawful seizure and deprivation of due process in violation of Plaintiff's rights as secured by the Fourth and Fourteenth Amendments to the Constitution of the United States.

59. Said actions were taken pursuant to and consistent with the policies of UHS.

## **J. DAMAGES FOR PLAINTIFFS**

60. As a direct and proximate cause of the occurrence made the basis of this lawsuit, was caused to and did suffer personal injuries and damages as follows:

   a. Reasonable medical care and expenses in the past. These expenses were incurred by Plaintiffs or the necessary care and treatment of the injuries resulting from the incident complained of herein and such charges are reasonable and were usual and customary charges for such services;

   b. Reasonable and necessary medical care and expenses which will in all reasonable probability be incurred in the future;

   c. Physical pain and suffering in the past;

   d. Physical pain and suffering in the future;

   e. Physical impairment in the past;

   f. Physical impairment which, in all reasonable probability, will be suffered in the future;

   g. Disfigurement in the past;

   h. Disfigurement in the future;

   i. Mental anguish in the past; and,

   j. Mental anguish in the future.

61. These amounts are to be determined by the jury.

# K. PRAYER

62. For these reasons, Plaintiffs seek judgment against Defendants, jointly and severally, for the following damages:

- a) Actual damages in the just and reasonable sum in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00);

- b) Prejudgment and postjudgment interest at the maximum legal rate;

- c) Costs of suit; and,

- d) All other relief the Court deems appropriate, including but not limited to attorney's fees.

Respectfully submitted,

*/s/ Mark Anthony Acuna*
Mark Anthony Acuna
Texas Bar No. 24064044
Federal Bar No. 997078

**Martinez & Associates, PLLC**
2828 Goliad Road, Suite 125
San Antonio, Texas 78223
Telephone: (210) 359-8250
Facsimile: (210) 359-8255
Email: mark.acuna@martinez-law.com

Patrick Ballantyne
Texas Bar No. 24053759
**LaHood Norton Law Group**
40 N.E. Loop 410, Ste. 525
San Antonio, Texas 78216
210ž 797ž 7700
Email: patrick@lahoodnorton.com

Attorneys for Plaintiffs